**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

BRICKETTE A. QUICK,

                          CIVIL ACTION NO. 16-cv-12582

        *Plaintiff*,           DISTRICT JUDGE PAUL D. BORMAN
*v.*                         MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 18, 19)

## I.    RECOMMENDATION

For the reasons stated above, the Court **RECOMMENDS** that Quick's Motion for Summary Judgment (Doc. 18) be **GRANTED**, the Commissioner's Motion (Doc. 19) be **DENIED**, and that this case be **REMANDED FOR FURTHER CONSIDERATION** pursuant to Sentence Four of 42 U.S.C. § 405(g).

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 5). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 18, 19).

On June 17, 2013, Plaintiff Brickette Quick filed an application for SSI, alleging a disability onset date of March 13, 2015. (Tr. 141-46). The Commissioner denied her claim. (Tr. 79). Quick then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on September 25, 2015, before ALJ B. Lloyd Blair. (Tr. 35-66). At the hearing, Quick testified, represented by a non-attorney representative, alongside Vocational Expert ("VE") Annette K. Holder. (*Id.*). On November 12, 2015, the ALJ found Quick not disabled. (Tr. 21-30). On April 11, 2016, the Appeals Council denied review. (Tr. 6-11). Quick filed for judicial review of that final decision on July 11, 2016. (Doc. 1).

## B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions

of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).    The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:   If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

## D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Quick not disabled under the Act. (Tr. 30). The ALJ found at Step One that Quick had not engaged in substantial gainful activity following the alleged onset date. (Tr. 23). At Step Two, the ALJ concluded that Quick had the following severe impairments: "fibromyalgia/chronic pain syndrome; migraines; degenerative changes of the cervical and lumbar spine; major depressive disorder/bipolar disorder; panic disorder; chronic post-traumatic stress disorder; and cluster B traits." (Tr. 23). At Step Three, the ALJ found that Quick's combination of impairments did not meet or equal one of the listed impairments. (Tr. 23-25). The ALJ then found that Quick had the residual functional capacity ("RFC") to perform light work, except with additional limitations as follows:

> [S]he can never use ladders, scaffolds, and ropes; she must avoid concentrated exposure to vibrations; she can never use pneumatic, torque, or power tools; she cannot perform commercial driving; she cannot use foot pedals; she is limited to simple, unskilled work involving up to three-step instructions; she is limited to jobs that do not involve concentration on detailed/precision tasks, multi-taking, computing, calculating, or problem solving; she cannot perform jobs requiring teamwork or working in close physical proximity of coworkers; she is limited to work involving minimal contact and directions from a supervisor; she is limited to brief and superficial contact with the public; she is limited to work at a flexible pace that has no production quotas mandating a specific number of pieces per hour or an up-the-line or down-the-line coworker depending on the claimant's productivity.

(Tr. 25-28). At Step Four, the ALJ found that Quick had no past relevant work. (Tr. 28). At Step Five, the ALJ determined that Claimant could perform work available in substantial numbers in the national economy. (Tr. 29).

### E.    Administrative Record

#### 1.    Medical Record

The Court has reviewed Quick's medical record. In lieu of summarizing her full medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

However, given its import to the remainder of the recommendation, I specifically note the findings of Leonard J. McCulloch, a limited licensed psychologist who evaluated Quick's mental health on October 15, 2015. (Tr. 562-74). McCulloch recorded Quick's complaints and description of her personal and medical history, which generally corresponds to her function report and testimony before the ALJ. (Tr. 562-68).

McCulloch found that it was "difficult to see how any serious employer would hire her given the multitude and severity and chronicity of problems she presented." (Tr. 572). He diagnosed mood disorder with major depressive disorder, post-traumatic stress disorder ("PTSD"), panic disorder, stress exacerbating somatic symptoms, chronic pain with associated psychological symptoms, cognitive disorder, poly-substance dependency and abuse. (Tr. 573). He further issued a global assessment of functioning ("GAF") score of 45[1], and found that she would be unable to manage her benefits. (Tr. 573-74). In a check-box form summarizing his findings, McCulloch found that Quick was markedly limited in terms of understanding and remembering detailed instructions; carrying out detailed

---

[1] A GAF score of 41 to 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

instructions; maintaining attention and concentration for extended periods; performing activities on a schedule; sustaining an ordinary routine; working in coordination or in proximity to others; completing a normal workday without interruptions from symptoms and without an unreasonable number of rest periods; interacting with the general public; accepting instructions and responding to criticism; getting along with co-workers and peers without distracting them; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others. (Tr. 575-76).

## 2. Application Reports and Administrative Hearing

### a. Function Report

Quick completed a function report on April 16, 2014. (Tr. 176-88). She complained of fibromyalgia, widespread body pain, panic attacks, back pain, chest pain, numbness, difficulty standing, sensitivity to lights and noises, muscle spasms, fatigue, chest pain, seizures, and PTSD. (Tr. 176).

Quick reported that she spent her time performing personal care, napping, spending time with friends and family who assist her with daily activities, and sleeping. (Tr. 177). She cooked, cleaned, and helped her daughter with homework. (*Id*.). Friends and family assisted with moving laundry up and down stairs, making beds, doing yard work, vacuuming, and going to stores. (*Id*.). Quick's sleep was interrupted by muscle spasms, headaches, and nightmares. (*Id*.). Leg, hand, and back pain impeded her ability to perform some self-care activities. (*Id*.). She required special reminders to shave her legs and brush her teeth, though it is unclear who provided these reminders. (Tr. 177-78). She used timers and alarms for medication reminders. (Tr. 178). Quick prepared all of her own meals,

which took about one and one half hours daily. (*Id.*). She found stirring and cutting food difficult, and thus restrained herself to cooking simple meals. (*Id.*). Quick did not perform housework or yardwork due to pain and depression. (Tr. 179).

Quick went outside "[a] couple times a day" to sit on her deck. (Tr. 179). Quick drove and rode in cars, and could go out without accompaniment. (*Id.*). She shopped in stores for food and other necessities. (*Id.*). She was able to handle money. (*Id.*). Her hobbies included reading and sewing. (Tr. 180). Reading for extended periods caused headaches. (*Id.*). Quick was unable to run and had difficulty walking "at times." (*Id.*). She spent time with others talking, playing cards, and watching movies. (*Id.*). Quick reported that she was starved and beaten as a child, and consequently did not trust others. (Tr. 181). She reported low self-esteem and felt "lost and angry" when suffering panic attacks because others would make fun of her. (*Id.*).

Quick wrote that she was limited in all areas of mental and physical functioning save for kneeling, talking, hearing, and seeing. (Tr. 181). She could walk for three to five minutes without rest, and could return to walking after roughly ten minutes. (*Id.*). When asked how long she could pay attention, Quick wrote "my mind wonders [sic]." (*Id.*). Quick could not remember multi-step instructions, and her faulty memory forced her to write things down. (*Id.*). Quick became angry when "told what to do;" she had been fired in the past for tardiness. (*Id.*). She could not handle stress "at all" as the result of childhood physical and verbal abuse inflicted by her parents. (*Id.*). Changes in routine caused Quick to become "confussed [sic] and angery [sic]." She complained of the unusual fear that "something bad is going to happen to me." (*Id.*). Quick wrote that she required use of a

wheelchair if she went "somewhere thats [sic] conciest [sic] of a lot of walking." (*Id*.). Quick's use of medication caused her to feel tired, jittery, and lethargic. (Tr. 183).

In the remarks section, Quick wrote that she relied on friends rather than family because of childhood abuse at the hands of her parents. (Tr. 183). She wrote that she had been beaten, raped, kidnapped, molested, moved from foster home to foster home, locked in rooms, starved, forced to dig a grave and threatened with execution at age eleven. (*Id*.). She was driven into alcohol addiction "to forget," but that even self-medication did not rid her of "the nightmares." (*Id*.). Finally, Quick wrote that she was "worked lik [sic] a slave all [her] life," and that her "body feels like its [sic] giving up." (*Id*.).

### b.    Quick's Testimony at the Administrative Hearing

At the hearing before the ALJ, Quick asserted that she had not worked since May 2013. (Tr. 41). She complained of limited mobility in the right hand, anxiety and panic attacks, pain in the back and neck, and whole-body neuropathy. (Tr. 42). Physical therapy worsened her neck pain. (Tr. 43). (*Id*.). Her pain level was "at least" seven out of ten during the hearing, with ten representing a trip to the emergency room, despite her use of pain relieving medication. (Tr. 43-44). She experienced numbness, tingling, and burning throughout her entire body. (Tr. 44). Quick was not at that time seeing a psychiatrist because she could not obtain a babysitter, but intended to return to therapy. (*Id*.). She attempted suicide in 2007 and was committed for about a week. (Tr. 45). Her medications caused dizziness, drowsiness, and lack of motivation. (*Id*.). She reported visiting the emergency room regularly for treatment of burning pain in her neck and migraines. (*Id*.).

Quick stated that she cooked but did not wash laundry. (Tr. 47). She shopped for groceries with the help of others due to lifting limitations. (*Id*.). Quick read books to pass the time. (*Id*.). She sometimes attended her child's school functions. (*Id*.). She visited friends and neighbors "[f]or a limited amount of time." (*Id*.). Her average day consisted of cleaning the house with regular breaks. (Tr. 48). She was unable to climb stairs, and could only sometimes pick up a dollar off the ground. (*Id*.). She was unable to squat due to back pain. (*Id*.). Using both hands, she could lift five to ten pounds. (Tr. 49). She could stand for five to ten minutes, sit for about ten minutes, and walk for "[m]aybe a block." (*Id*.). Quick's non-attorney advisor then attempted to focus the ALJ's attention on Quick's mental issues, because these issues were "key" to Quick's claim. (*Id*.).

Quick had no contact with her mother after age three; her mother was a prostitute, and both parents were "very extreme" drug addicts. (Tr. 50). At age three, Quick's parents permitted their drug dealer to sexually assault Quick. (*Id*.). Quick was removed from her mother's custody after she was mauled by her mother's dog, which caused painful scarring on the right arm. (Tr. 51). A drug dealer later attempted to kidnap Quick, and she was removed from school permanently. (Tr. 52). Quick later obtained her diploma through online schooling. (*Id*.). During her formative years Quick slept in a garage with more than fifty caged animals; she was made to care for the animals and bury them when they died. (Tr. 53). She was physically abused by her parents during these years on a daily basis. (*Id*.). She ran away from home at age fifteen. (Tr. 54). Quick moved in with her sister, who was also a drug addict; the sister's husband tried to sexually abuse Quick, and she was kicked out of her sister's home at age sixteen. (Tr. 54-55). She "lived on the streets, lived in bus

stations and parks, in a women's shelter." (Tr. 55). Quick was "forced into prostitution," during which time she abused alcohol. (Tr. 55-56). Quick then was overcome with severe pain, panic, and anxiety which forced her to quit prostitution. (*Id*.).

Quick suffers from PTSD which caused nightly nightmares. (Tr. 57). She regularly wakes "screaming," and is unable to return to sleep; she grows "very angry" on a daily basis. (*Id*.). She sometimes "act[ed] on that anger," including telling a woman at the grocery store "the other day . . . I was going to stab her in the face because she made me mad." (*Id*.). She experienced severe pain as the result of PTSD and physical ailments. (Tr. 58). She did not "like going out," and avoided "associating with people." (*Id*.). She took antidepressants for treatment of anxiety, panic attacks, and depression. (*Id*.). She lived "like a hermit." (Tr. 59). She experienced anger, paranoia, and hate, and was loath to trust others. (*Id*.).

Quick also complained of headaches "[a]t least five times a week," which lasted for between eighteen hours and several days. (Tr. 60). She was immobilized by these headaches, and found it necessary to lay down in the darkness with a washcloth on her head. (*Id*.). She was unable to complete any chores during this time, and was thus "down most of the time." (Tr. 60-61).

### c. The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Quick's ability to perform work. (Tr. 62). The ALJ asked questions regarding Quick's past work, but this testimony is irrelevant to the current appeal because the ALJ did not base his decision on Quick's past work.

The ALJ then asked the VE to imagine a worker with Quick's age, education, and work experience, and who is capable of performing light work, but who is further limited to

> [N]ever us[ing] ladders, scaffolds, or ropes, should avoid concentrated exposure to vibration, never use torque, pneumatic, or power tools, do no commercial driving, never use foot pedals. The individual should be restricted to simple, unskilled work involving one, two, or three-step instructions. No jobs involving concentration and detailed or precision tasks, multi-tasking, computing, calculating, or problem solving. Jobs that do not require teamwork or working in close physical proximity of coworkers. Work that involves minimal contact and directions from a supervisor. Work requiring only brief or superficial contact with the general public, and work at a flexible pace that has no production quotas mandating a specific number of pieces per hour or having a down line or up line coworker dependent upon the individual's productivity.

(Tr. 63-64). The VE concluded that such a worker could perform a significant number of jobs available in the national economy, including work as a bench assembler (125,000 jobs nationally), sorter (84,000 jobs), and retail marker (70,000 jobs). (Tr. 64). The ALJ did not ask a second hypothetical. (Tr. 65). Quick's non-attorney representative noted that, if found credible, Quick's testimony that she would be off task regularly due to headaches would render her unemployable. (*Id*.). Quick's representative also requested that, in light of Quick's history of severe abuse, that the ALJ order a consultative examination with a psychiatrist or psychologist to determine whether Quick's "extremely severe" mental issues disabled her from work. (*Id*.).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various

categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513.

"Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to

"other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Hammond v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective

evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Hammond v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is

measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G. Analysis

Quick argues that the ALJ erred in the following ways: 1) Erroneously concluding that Quick does not meet or equal Listing 12.07, which covers somatoform disorder; 2) Insufficiently engaging with the medical evidence, and thereby failing to construct a logical bridge between the evidence and the ALJ's conclusion, particularly in light of Quick's fibromyalgia and migraines; 3) Inadequately addressing the supportability of Quick's alleged symptoms in light of the factors set forth in 20 C.F.R. §416.929(c)(3); 4) Giving inadequate weight to the findings of examining psychologist McCulloch. (Doc. 18 at 12-25). These arguments overlap to a significant degree, and I address them jointly where appropriate below.

### 1. The ALJ Granted Appropriate Weight to Quick's Treating Physician

Quick first argues that the ALJ erred by concluding that she does not meet or equal Listing 12.07. The ALJ and the Commissioner's medical examiners considered whether Quick met Listings 1.04, 11.03, 12.04, 12.06, 12.08, or 14.09, but did not consider whether she met Listing 12.07. (Tr. 24, 72). Listing 12.07 governs somatoform disorders; to meet this listing, the claimant must satisfy both subsections A and B. It provides as follows:

    A. Medical documentation of <u>one</u> or more of the following:

        1. Symptoms of altered voluntary motor or sensory function that are not better explained by another medical or mental disorder;
        2. One or more somatic symptoms that are distressing, with excessive thoughts, feelings, or behaviors related to the symptoms; or
        3. Preoccupation with having or acquiring a serious illness without significant symptoms present.

  AND

    B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

          1. Understand, remember, or apply information (see 12.00E1).
          2. Interact with others (see 12.00E2).
          3. Concentrate, persist, or maintain pace (see 12.00E3).
          4. Adapt or manage oneself (see 12.00E4).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07. The ALJ noted that many of Quick's alleged impairments were not borne out by physical testing, and concluded on this basis that her alleged symptoms were only partially credible. (Tr. 26-27). Quick argues that the inconsistency between her symptoms and her physical condition is not proof that she is a malingerer seeking benefits, but rather is proof that she suffers from somatoform disorder in a manner which renders her disabled under Listing 12.07. (Doc. 18 at 12-17). Quick notes that a physician, Dr. Stein, found in October 2013 that Quick suffered from "multiple vague organ system complaints, differential[2] includes possible somatization disorder, especially with increased life stressors and significant psychiatric history." (Tr. 580). The

---

[2] A "differential diagnosis [is] a technique that identifies the cause of a medical condition by eliminating the likely causes until the most probable cause is isolated." *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000).

ALJ did not cite Dr. Stein's treatment note, and made no reference to Quick's possible somatization disorder.

Claimants bear the burden of demonstrating that they meet or equal a listing at Step Three. *See Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727 (6th Cir. 2004). Some courts have therefore looked to whether the claimant put the ALJ on notice that a listing was at issue. *See Isham v. Colvin*, No. CIV. 13-2377 JRT/SER, 2015 WL 691411, at *30 (D. Minn. Feb. 18, 2015) ("Because the ALJ was on notice from the hearings and counsel's brief that mental retardation under Listing 12.05C was at issue, the ALJ should have considered Listing 12.05C."); *Swint v. Comm'r of Soc. Sec.*, No. 1:13CV582, 2014 WL 4426246, at *5 (S.D. Ohio Sept. 8, 2014) (remanding where the claimant did not specifically discuss Listing 3.03, which relates to asthma, but presented arguments relating to asthma which were sufficient to put the ALJ on notice that the listing was implicated). The Sixth Circuit has instructed that where "the record 'raise[s] a substantial question as to whether [the claimant] could qualify as disabled' under a listing . . . the ALJ should discuss that listing." *Sheeks v. Comm'r of Soc. Sec.*, 544 Fed. Appx. 639, 641 (6th Cir. 2013) (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)).

The ALJ has a coterminous duty to consider whether the claimant's ailments, both severe and non-severe, meet or equal a listed impairment at Step Three. *See McGlothin v. Comm'r of Soc. Sec.*, 299 Fed. Appx. 516, 522 (6th Cir. 2008) ("[O]nce any impairment is found to be severe, the ALJ must consider both severe and nonsevere impairments in the subsequent steps . . . . It then became 'legally irrelevant' that her other impairments were determined to be not severe."); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)

("The totality of impairments includes impairments that are not "severe impairments" under step two."); *Wysocki v. Comm'r of Soc. Sec.*, No. 13-CV-14505, 2014 WL 5499375, at *6 (E.D. Mich. Oct. 30, 2014) ("[A]t step three, the ALJ was required to consider whether all of plaintiff's impairments—severe and non-severe—met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1."); *Hairston v. Comm'r of Soc. Sec.*, No. CIV.A. 11-14974, 2013 WL 1326220, at *7 (E.D. Mich. Jan. 25, 2013) ("To comply with step three, the ALJ does not have to articulate, at length, the medical equivalency issue; however, she should review all of the evidence surrounding Plaintiff's severe and non-severe impairments to determine if they are medically equivalent to a listed impairment."), report and recommendation adopted sub nom. *Hairston v. Astrue*, No. 11-14974, 2013 WL 1296867 (E.D. Mich. Mar. 30, 2013).

Yet the ALJ's obligation to discuss the claimant's severe and non-severe impairments at Step Three does not obligate the ALJ to discuss "every single impairment." *Bledsoe*, 165 F. App'x at 411. In any case, ALJs are not required to consider listings that the claimant "clearly does not meet." *Sheeks*, 544 Fed. Appx. at 641. While this is hardly a bright line standard, it appears that the ALJ's Step Three determination must be measured by the weight of evidence supporting a claimant's listing argument, and the degree to which the ALJ was put on notice of that listing argument.

In this case, there is not an explicit diagnosis of somatoform disorder in the record. Instead, the only use of the term "somatoform disorder" appears in Dr. Stein's treatment note, wherein she rendered a differential diagnosis of somatization disorder. (Tr. 580). While Listing 12.07 can be met without an explicit diagnosis of somatoform disorder, the

ALJ would have been more clearly on notice of Quick's argument under Listing 12.07 if a formal diagnosis had been rendered. While Dr. Stein was the only physician to explicitly suggest the existence of a somatic disorder, numerous treating professionals noted the existence of somatic complaints. (Tr. 246, 248-79, 286, 289-97, 316-318, 320, 332, 335, 352, 362, 475-82, 486, 496, 501, 557, 560, 569-70, 591). While the Commissioner argues that "there is an explanation for Plaintiff's physical symptoms" (Doc. 19 at 7), the ALJ himself recognized that objective data could corroborate only some of Quick's alleged symptoms, and further noted that many of Quick's complaints "cluster B traits were playing a role in her somatic complaints" (Tr. 27). The Commissioner cannot have it both ways. If (as the ALJ recognizes) Quick's symptoms are primarily the result of longstanding and disruptive somatic complaints, Quick should have been evaluated under Listing 12.07. If (as the Commissioner now suggests) Quick's allegedly disabling physical symptoms were fully explained by objective evidence, she would be rendered unable to perform the sort of work identified in the ALJ's RFC. There is ample evidence in the record from which the ALJ could have concluded that Quick met or equaled this listing. In particular, she arguably meets each subsection of the "A" criteria. Her claim for meeting the "A" criteria is significantly bolstered by the ALJ's conclusion that Quick's complaints were generally credible despite the absence of corroborating physical evidence.

Further, the report issued by consultative psychological examiner McCulloch amply supports Quick's argument under section "B" of Listing 12.07, including a finding that she was "severely" limited in her ability to interact with others, adapt to changes, and perform work related activities. (Tr. 572).

The ALJ assigned only "some weight" to McCulloch's report, finding that the "degree of limitation found by this psychologist" was not supported because "outpatient therapy records reflect symptoms generally in the moderate range," and because "there is no record of hospitalization, active suicidal ideation, or psychotic symptoms." (Tr. 28). This justification is not well supported. The suggestion that Quick's mental symptoms were "moderate," without further support, does not provide a substantial foundation for judicial review. The ALJ fails to compare or even reference which findings mental symptoms he finds "moderate," and indeed the ALJ's own review of Quick's many, longstanding, and credible complaints of mental ailments belies this characterization. (Tr. 26-28). While Quick had not recently expressed suicidal ideation, was not recently hospitalized, and was not displaying psychotic symptoms, these facts cover only a narrow spectrum of Quick's mental health, and do not negate her somatic complaints and overall state of mental illness.

Furthermore, the ALJ was put on notice of Quick's somatoform disorder by the representative brief submitted to the ALJ prior to the oral hearing, wherein Quick's non-attorney representative noted Quick's "significant emotional and somatic preoccupations." (Tr. 221). The ALJ indeed noted that Quick "was preoccupied with somatic complaints and exhibited limited insight about how her behaviors, mood instability, and relationship difficulties were contributing to her life stressors." (Tr. 27). The ALJ pointed to evidence that Quick's treatment has "remained conservative," and that "diagnostic imaging has not shown marked abnormalities." (Tr. 28). Despite finding a disconnect between Quick's physically determinable impairments and her alleged symptoms, the ALJ concluded that Quick's complaints were "generally credible" insofar as she alleged experiencing "diffuse

pain throughout her body, chronic migraines, and numbness/tingling in the extremities." (Tr. 27).

Determining whether Quick meets Listing 12.07 is particularly crucial because meeting that listing flips the analysis of the claimant's somatic complaints on its head. Generally, claimants who express symptoms which are not corroborated by other evidence are found non-credible, and their lack of credibility forms a major justification for denial of benefits. *See Madden v. Comm'r of Soc. Sec.*, 81 F.3d 160 (6th Cir. 1996). A claimant suffering from somatoform disorder is not prevaricating for the purpose of obtaining benefits by fraud, but rather genuinely believes that they suffer from ailments which have no basis in fact. *See Nowling v. Colvin*, 813 F.3d 1110, 1114 (8th Cir. 2016) ("'In cases involving somatoform disorder . . . an ALJ is not free to reject subjective experiences without an express finding that the claimant's testimony is not credible.'") (quoting *Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir. 1995)). Therefore, Dr. Stein's differential diagnosis of somatoform disorder supports Quick's claim that she meets or equals Listing 12.07. Inconsistencies between Quick's ailments as she perceives them and as they exist therefore support her claim of disability.

Where the record contains a differential diagnosis of somatoform disorder and repeated, longstanding somatic complaints; where the ALJ was put on notice by the representative's brief that the claimant suffered from many somatic ailments; and where the ALJ recognized that the claimant's complaints were credible despite little physical evidence corroborating those alleged ailments, the ALJ should have considered whether Quick met or equaled Listing 12.07.

Remand is appropriate to determine whether Quick meets or equals Listing 12.07. If the Commissioner concludes that Quick does not meet Listing 12.07, her claim should be resubmitted to a medical examiner for determination of whether she equals Listing 12.07. *See Retka v. Comm'r of Soc. Sec.*, 1995 WL 697215, at *2 (6th Cir. Nov. 22, 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made.") (citing 20 C.F.R. § 416.926(b)).

### 2. The ALJ Did Not Adequately Address Quick's Fibromyalgia, Migraine Headaches, or Treatment

Quick next argues that the ALJ failed to "build an accurate and logical bridge between the evidence and result." (Doc. 18 at 13). She complains that the ALJ did not properly assess Quick's fibromyalgia or migraines, and that the ALJ failed to address Dr. Stein's differential diagnosis of somatization disorder. (*Id*.). Having already addressed the ALJ's failure to discuss Dr. Stein's findings, I focus my attention on the ALJ's treatment of Quick's fibromyalgia and migraines.

Quick asserts that she suffers from extensive pain and non-exertional limitations as the result of fibromyalgia, including fatigue and ambulation limitations, and that these limitations prevent her from performing light work. (Doc. 18 at 16). The ALJ devoted two paragraphs to discussing Quick's physical symptoms, noting her functional capacity, radiological test results, and self-asserted activities of daily living. (Tr. 26-27). The ALJ noted that Quick's treatment has been "relatively conservative," in an "office setting," and has "consisted of prescription medication with a short bout of physical therapy," with medication providing "some relief" from her physical ailments. (Tr. 27).

Quick asserts that fibromyalgia is a disorder for which conservative treatment is appropriate. (Doc. 18 at 19-20). In essence, Quick argues that the evidence of record demonstrates that she is thoroughly disabled by fibromyalgia, and that her course of treatment supports her allegations regarding the impact of that ailment.

The Sixth Circuit has strongly and repeatedly held that fibromyalgia is a disease amenable only to conservative treatment. *See Kalmbach v. Comm'r of Soc. Sec.,* 409 F. App'x 852, 861 (6th Cir. 2011) ("[T]he ALJ's rejection of the treating physicians' opinions as unsupported by objective evidence in the record obviously stems from his fundamental misunderstanding of the nature of fibromyalgia."). *See also Rogers,* 486 F.3d at 243–48 ("[T]he nature of fibromyalgia itself renders . . . over-emphasis upon objective findings inappropriate."); *Preston v. Sec'y of Health & Human Servs.,* 854 F.2d 815, 818, 820 (6th Cir. 1988) (noting that evidence such as normal strength and x-ray scans "are not highly relevant in diagnosing fibrositis or its severity").

The ALJ's finding that Quick treated her physical symptoms conservatively thus provides little or no support for discounting Quick's alleged limitations resulting from fibromyalgia. If the ALJ wished to critique Quick's allegations of fibromyalgia pain, he should have focused on either the inconsistency of her treatment, or on inconsistency between her activities of daily living and her alleged pain. This sort of analysis is conspicuously absent from the ALJ's decision. Upon remand, the ALJ should reconsider Quick's fibromyalgia symptoms with an eye to the consistency of her treatment and consistency between her alleged symptoms and her activities of daily living.

Quick also asserts that the ALJ wholly failed to perform a meaningful analysis of her migraines and limitations they impose. (Doc. 18 at 16-17). Indeed, while the ALJ recognizes that Quick suffered from chronic migraines, his decision does not explicitly discuss the limiting effects of those migraines. (Tr. 27). Likewise, while the ALJ notes that "[m]edication has been noted as being helpful on numerous occasions" (Tr. 27), the ALJ fails to note that Quick's conditions, including migraines, were not wholly resolved by medication. (Tr. 245-60, 285, 318, 327, 476, 580, 592, 605, 609, 624).

The ALJ's failure to fully address Quick's migraines is particularly egregious given that Quick complained of headaches occurring at least five times weekly, lasting for between eighteen hours and several days, which rendered her immobilized, and would inevitably result in Quick being totally disabled from work by this ailment alone. (Tr. 60-61). Quick's own representative expressed some skepticism regarding this self-reported degree of limitation at the oral hearing, noting that such frequent and disabling headaches would render Quick unable to function "most of the time." (Tr. 61).

While there is perhaps good reason to doubt Quick's asserted degree of limitation resulting from migraine headaches, the ALJ fails to engage with this evidence in his decision. Given that the Court recommends remand for other reasons, the ALJ ought to use this opportunity to more thoroughly consider the limitations imposed by Quick's headaches.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Quick's Motion for Summary Judgment (Doc. 9) be **GRANTED**, the Commissioner's Motion (Doc. 10) be

**DENIED**, and that this case be **REMANDED FOR FURTHER CONSIDERATION** pursuant to Sentence Four of 42 U.S.C. § 405(g).

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date:  April 25, 2017                                   S/ PATRICIA T. MORRIS
                                                        Patricia T. Morris
                                                        United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date
through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: April 25, 2017                                   By s/Kristen Castaneda
                                                       Case Manager